May it please the court, James Fife of Federal Defenders, on behalf of the appellant, Mr. Cao. The convictions here require reversal and the sentence should be abated. Unless the court has a preference, I'll discuss first the wire fraud counts, then two issues going to all the counts, and finally the sentencing errors. The Rule 29 on Case 427 should have been granted. No rational trier of fact could find that the holiday party on which the three wire fraud convictions were based was any more essential to the meeting two months later that was the subject of the three acquitted accounts. The hotel's use of the wire to offend the backroom account... Sorry, wasn't there a difference in the evidence? There was testimony about the, what was it, December? Yes. This meeting, and no testimony about the February meeting? That's correct. There was actually two of the 170 investors actually attended the December meeting. So the jury had that. But there was nothing in that fact which made it more material or made it more essential. Because, in fact, the evidence was... It doesn't have to be essential under Schmuck. It can be foreseeable and incidental. That's correct. It has to be incidental to an essential part of the fraud scheme. And this was not. This was very much like the kinds of wire or mail transfers which occurred in Mays, Parr, and Phillips. Because these were just backroom accountings. These were just backroom payments for the meeting. They had nothing. They were not an essential part. Well, in... I'll try to be as transparent as possible, because you don't have me on this yet. In Schmuck, somebody was turning back odometers, selling them to dealers, and it was foreseeable that the titles would be mailed. So that was sufficient to satisfy the mailing element of the mail fraud. As I read the evidence here with regard to the December meeting, if it was December, some of the investors said there was this big party. It was lavish. Dividends were passed out to investors. Some people got $100 bills. And it gave me confidence in Mr. Cowe. Mr. Cowe paid with his American Express, and foreseeably the jury could have found, arguably could have found, did find, that the wires were used to process the American Express payment. If those are accurate readings of the record in the light most favorable to the verdict, how is this case materially different than Schmuck? Well, let me just say that the transfers of the titles in Schmuck were through the mail. But what the court said in Schmuck, and this is on page 712 of the decision, they said that without these mailings, there would have been an abrupt halt to the fraudulent scheme. And they said that it was naturally dependent on the mailing of these transfers of title. Now, I don't think you can say that about the Christmas party at the Hyatt Hotel, that the scheme would have come to an abrupt halt if it wasn't held, or that it naturally depended on having this holiday party. Because probably the first piece of evidence to show it wasn't naturally dependent on us, this party was held 20 months into the alleged scheme. This was 20 months after the original offerings of Lakeview Estates back in April of 2005. Now, it's not something that ground to a halt any time in those 20 months before, because there wasn't another party. Now, it certainly... Isn't it the fact that having those parties and all the lavish lifestyle attended to it lulled the victims into a false sense of security, which permitted the scheme to continue? Your Honor, it had one of the two investors who attended. Both of them said that they thought it was very impressive. They thought the party was very nice, the food was good. They talked about this game where $100 was given out for people who answered questions correctly. But to say that that was an essential part, I mean, certainly it may have had some function. But Schmuck is talking about incidental, not essential. Your Honor, what is required is that it be an essential part. It be incidental that the mailing, the use of the wire, the use of the mails is incidental to an essential part of the fraud scheme. An essential part of the fraud scheme was to cause the investors to think that Mr. Cowe was fabulously successful in making money. He drives a Bentley. He wears a $7,000 watch. And he has the money to give lavish parties. Your Honor, I don't think that's a reasonable interpretation to say that this was so essential or that the wire transfer was actually that closely anything but tendentially connected to that. That's why I get back to the cases of Mays and Parr, both Supreme Court cases, and this Court's recent decision in Phillips. I think those are exactly on point. In Mays, this was a case where the defendant fraudulently used the credit card and then the Supreme Court said, well, the fact that those, that the hotel, the motel sent those bills through the mail in order to get payment was not sufficient to find wire mail fraud. It's as Justice Scalia said in his dissent in Schmuck, it's mail fraud, not mail and fraud. So it has to be something that requires that the mailing or the use of the wires is more intimately associated. The same thing with Parr. Again, the defendants there used a credit card to buy gasoline. They used a government credit card to buy gasoline for personal purposes. And the mail connection was that the gasoline companies sent the bills through the mail. And again, the Supreme Court said, no, that is not sufficient. And finally, Phillips, a very recent case. The case of Parr, didn't they say it was not sufficient because the scheme had already reached fruition? That's true, Your Honor. I mean, they say, like, because that's what's interesting about it. In both Mays and Parr, the actual fraud was the use of the card. So it seems like the connection between the mailing of the bills for payment and the fraud is even closer in Mays and Parr than here. Well, but wasn't the scheme ongoing when he mailed his annex bills? Yes, Your Honor. It hadn't, the alleged scheme hadn't concluded at that point. But that's no different from, say, Phillips, because this was also an ongoing scheme where, again, there was a much more intimate connection between the use of the mail and the fraud, because the fraud in Phillips was precisely to misappropriate money to buy watches, which the jeweler then mailed to the defendant. Now, again, the court said, like Mays, that this is just completely incidental to it, because. Okay. So I, there are, it's well known in the financial industry that, you know, major financial entities, private equity firms, et cetera, host these lavish things to make presentations and make their clients feel that they're getting returns on their investment, and that's legitimate business. Legitimate businesses do that. And then they're not lulling their clients into a false sense of security. It's a true sense of security. Why is this any different than that? Your Honor, because there's a couple of things to say why. If you don't accept that just the use of the wire is completely incidental, because otherwise does it really make a difference whether Mr. And it's totally incidental that he happened to use a credit card. And in today's wired world, what transactions are in cash? I know I can go a month without spending any kind of cash and do everything with a card of one sort or another through the Internet. So are we getting to a point where just about every transaction is going to be, involve a wire or mail transfer? But let me speak specifically about the Hyatt party and why that's not essential. As I said, it was 20 months into this alleged scheme. It was not something that was so important that it had to come any earlier. It just was very kind of thrown together incidentally. There was only a fraction of the investors, of the 170 investors, who were even invited through the email. I estimated about 25% were even invited. So again, that's not an essential part of the scheme when only a fraction of the investors are even involved. And then only two of them attended. That is precisely 1.2% of the investors in these schemes. One percent of the investors can't be an essential part if all that is involved in this. And just, I just, this is not rhetorical, but I've. Yes. Where, what do you rely on and where in schmuck, if it's schmuck, does it have to be an essential part of the scheme rather than foreseeable and in furtherance of the scheme, possibly incidentally? Your Honor, I don't have the quotes in front of me, Your Honor, but I believe that that's constantly how it's stated, that it has to be incidental to an essential part. And I think that's inherent in the way, you know, schmuck was talking about how the scheme would have come to an abrupt halt, but for these mailings. That's what's required, is that it has to be essential to the point where the scheme couldn't go forward. And perhaps if I save a minute or two, I can get back to the citation for that particular standard. The other thing is that of the two investors who attended the HIA party, only one of them invested any further in a later scheme. Three months later, after reading more documentation and attending meetings, one of the two investors invested in TG Capital. The other one declined altogether. So what it comes down to is exactly 0.6% of the investors in all of these schemes was affected by this party. Now, it doesn't seem like that probably was a very essential part of the scheme. It wouldn't have gone to a halt if 0.6% of the investors didn't continue on because of it. Now, the other thing is that there was no promotion of a scheme at this party. It was a holiday party. There were people who were investors and shared that common interest. But as I pointed out, this is a very curious kind of lulling when Mr. Cow stands up and says, you know, this investment is dodgy. I don't think that we should – I'm going to pull my money out of it. What kind of lulling is that when you have this huge party, and the principal comes in and says, I don't believe these investments are sound. I'm rethinking this. And then he doesn't even have the alternative scheme set up for people to get into. There was no literature. There was – in fact, none of the witnesses even remembered that he mentioned the name of the substitute scheme, that he just said there's something else that I'm thinking of. Why would someone come in and upset the apple cart like this in the midst of a lulling? It just doesn't make any sense that this was lulling when he was actually – as the witness said, I was scared by that. I mean, he's scaring his investors, not lulling them. And so the government says that there was an essential need to lull at this point, but their chronology is just off. Mr. Cowe, as shown by the state case, People v. Cowe, the facts as recited by the Court of Appeals there, that in fact Mr. Cowe didn't learn about the collapse of Fink Mortgage until almost a week after this party. So how could he have had an urgent need to overawe these investors and keep them from becoming rested and asking for their money back when he himself didn't know about the terminal collapse until a week later? But isn't the issue whether a reasonable jury could have found beyond a reasonable doubt and everything is a link in a – can be a brick in a scheme. You know, once you impress people enough to give you money, you want to sustain their confidence. That's true. So why could the jury – you know, did you try the case below? No, I didn't. Maybe you should have. You know, you could have argued all of these things, but you're arguing to us as if we're the jury and we shouldn't find this beyond a reasonable doubt as opposed to concluding that no reasonable jury on the evidence could reach this conclusion. I think that's exactly the point, Your Honor, is that you are to determine whether a rational juror could find these – that this was an essential part of the scheme beyond a reasonable doubt. So why couldn't a rational juror say that Mr. Cowe, since he wasn't really investing any of this money anyway, he was living off of it, had to continuously impress people who had invested and get new investors because this is a Ponzi scheme, so giving this party and handing out hundred-dollar bills would promote that kind of misplaced confidence in him. Why is that irrational? No, the theory is completely irrational, Your Honor, but the problem is it doesn't fit the facts. The facts show that this meeting was held far into the scheme, that very few people were targeted. That is, that if he really had a concern, he would have invited all 170. He wouldn't invite some portion. He would have tried to make sure that they were all there. It could be part of the scheme. It could be an effort to get new investors. If you have a Ponzi scheme, you need new investors. That's correct, Your Honor, and there's no evidence whatsoever that that was happening here. There was no promotional material here. There was no sign that anybody invested new, that there were new investors involved with this. This was not one of the meetings like they were held at Nesseverian's house where that was for the purpose of recruiting new investors. This was just a celebration party for the people who were already invested and who actually had been invested in some cases for many months, over a year, and showed no signs of being restive. None of the witnesses said that they were considering withdrawing their money any time at this stage that these parties were held. And really the most significant contrast is there was absolutely no difference between the February and the December meetings as far as the location, the lavishness, the planning, the number of people who were invited to plan to come. Powell is a Supreme Court case that says even if you have inconsistent verdicts, that is not a reason to, you know, for appellate court or trial court to acquit on the one on which somebody was convicted. That's correct, Your Honor. And I'm not asking the court to act on that, but to show, but the split verdict is to show the irrationality of the jury's decision here and why no rational juror could have convicted on the December counts when exactly the same circumstances held in February with one major exception. In February, it was clear that the dam was bursting because by then, Mr. Cowe had already been arrested, his laptop had been seized by the sheriff, and if anything, he was in a more desperate need to lull restive investors because the thing was coming unzipped at this point. And yet the jury acquitted. But no, but am I correct that nobody who attended the February party testified at trial? That's correct. But there was also no doubt, no dispute that the party was held in the same place under the same conditions. But couldn't that be viewed as suggesting that the jury did a good job in scrutinizing the evidence? And they said, well, we've got the testimony of these two people about December and we're persuaded that, you know, this was an effort to promote the scheme and we haven't heard from anybody on February, so we're not persuaded beyond a reasonable doubt that that had the same purpose. I don't think so, Your Honor, because I think what it shows is that they just decided that they were going to reach a compromise verdict and we decided, well, okay, we think something's up, so we're going to convict on these December ones because we've heard something about a conspiracy, so we're going to convict on these wire fraud accounts. And we'll convict on the ones we didn't hear any evidence. But, in fact, there was no logical way to distinguish them. You know, actually, that raises a good point that are you challenging the sufficiency of the evidence to prove guilt on the conspiracy count or only the substantive wire fraud counts? Just the wire fraud counts. Okay. So your client would be guilty of conspiracy in any event? No, Your Honor, because I believe that there were two other reasons which I'm not going to be able to get to why the convictions, all the convictions should be reversed. All right. Let's get there. Yeah, let's get there. Okay. Thank you. Oh, okay. Yeah, let me talk first about the, well, just briefly about the inclusion of improbative but prejudicial evidence. There was a mass of evidence that really didn't need to be admitted here to show anything of consequence. There were things that were brought in only to show Mr. Powell as someone who lavishly spent other people's money. The Las Vegas stay and the luxury goods, there was never any link to investor funds. So the government's argument or the reason that the district court reserved a ruling on those was never made because there was no showing that the bills or that any of those things were purchased using investor funds. Does the record, I agree that on some of these I'd have to go back and refresh myself. They were conditionally admitted essentially under Rule 104B and the judge didn't make a final ruling. However, did defense counsel ask for a ruling on the matters that are conditionally admitted? I don't believe, Your Honor, that there was a request in the end that they revisited. I don't think there was. And Huddleston, which is a conspiracy case, and I think there are some others, placed the burden on the attorney, not the judge. And if the attorney doesn't make the request, at least you're under plain error review. That could be, Your Honor. But I feel like some of it is so plain it's as plain as the nose on your face. Because, for instance, take one item, the laptop bag, the Louis Vuitton laptop bag. The undisputed evidence was that that was bought in September 2004. That is months before, five or six months before the first, the beginning of the indictment. And as found by FINRA, that these schemes started in April 2005. There's no way that that bag could have been bought with investor money. It was bought months before. But similarly, none of these luxury purchases or the payment of the hotel bill was never connected to investor money. The receiver could only put money in any of these accounts, investor money in these accounts, probably at the earliest, realistically, January 2007. If there was an error there, why wasn't it harmless? It's harmless. It's not harmless, Your Honor, because this was drumbeat. As I pointed out, this was a cumulative error problem because there were so many of these. There were the luxury goods. There was the stay in the hotel. There was the Bentley. There was the Goldman Sachs letters. And then there was the ---- But what's wrong with the Goldman Sachs letters, for example? Nobody ever saw them. How can they be used to induce fraud when nobody saw them? They can be part of it. They can be evidence of a scheme to defraud. One of the things you have to prove is intent to defraud, right? Yes. Okay. So the fact that he's fabricating Wells Fargo letters and Goldman Sachs letters out of thin air could be evidence of his state that has to be proven beyond a reasonable doubt, intent to defraud. Your Honor, I think that to me that seems dangerously close to what the district court said when he said that it shows the jury that he's up to something. That sounds like propensity to me, Your Honor. It sounds like intent to defraud to me. Well, the problem is that the Goldman Sachs letters were not aimed at investors. It was aimed at a purpose that was absolutely antithetical to the Ponzi scheme because it was ostensibly aimed at getting people to take money away from the Ponzi fund. He was using the letter to try to convince the casino owners to allow him to invest the supposedly stolen money in that account. And as I pointed out, that's just the opposite of anyone who would run a Ponzi scheme, would try to invest money in a real investment. So even if it is fraudulent, even if it's just made up, it can't have any logical relevance to a Ponzi scheme because it's actually contrary, counterproductive to a Ponzi scheme. All right, counsel. Thank you. You're well over your time. Thank you very much. Good morning, Your Honors. May it please the Court. Joseph Orobon on behalf of the United States. The jury correctly convicted Mr. Cao of three counts of wire fraud and one count of conspiracy to commit mail-in wire fraud in a massive Ponzi scheme that Mr. involving more than 190 investors, losses of about $12 million. How do you explain the not-guilty findings on the substantive counts of wire fraud in February as opposed to December? I think the material difference between the event that was charged with respect to the December event and the February event is exactly as Judge Wolf pointed out. There were two witnesses that testified with respect to what actually occurred at that December event. They were present at that event. They presented testimony about the lavishness of the event, the abundance of food. And in contrast to what the appellant has argued, they weren't the only two investors that were at that meeting. There was also testimony from those investors that there were other investors at that meeting. And there was a presentation that was given at that meeting by Mr. Cao. He talked about Think Mortgage. He told those investors, I don't like what's going on at Think Mortgage. I'm rolling my money out and I have a new investment program that I'm getting into. Contrary to what the appellant argued, this is 20 months after the Ponzi scheme began. This is an ongoing fraud. Mr. Cao is perpetuating a Ponzi scheme over and over with new ideas. First it's real estate. Then it's casinos. Then it's mortgages. And then it's TG Capital, that fraudulent scheme involving Wells Fargo. So I think, Your Honor, that's the material difference is that we actually had witnesses that testified as to what occurred at that event and their impression of the event. They left that event having more confidence in Mr. Cao. And they were impressed by that event. I think that definitely goes to two important aspects of the wire, and that is it's an ongoing fraud, clearly, because Mr. Cao is pitching in the middle of this new investment scheme. And it's to lull them into a false sense of security. As you recall, the Think Mortgage itself, Mr. Cao, in an email to investors in February 2006, told them that the principal was guaranteed. If Mr. Cao doesn't get their sense of security in front of him in that December meeting, they could start demanding the return of their guaranteed principal, which he knows is loss. And I think the record shows, as the receiver went through the 40 or so bank accounts, that the receiver specifically said, in looking at Think Mortgage, that it failed before it started. And he traced that money through. Mr. Cao was a sophisticated businessman. He had a degree, a bachelor's degree in business. He was a registered representative in the NASD. He knew where the money went. It's not as if he took the investors' money in February and then somehow lost track of it until December 16th, when he had that meeting with Ameridio, where he threatened to chop up somebody's baby. I mean, this is an individual who was sophisticated, coming up with these schemes involving Goldman Sachs, Wells Fargo, UBS. So I think, Your Honor, that's a material difference. I echo what Judge Woolf said, too. It has to be incident to a part of the scheme. It doesn't have to be essential. It has to be incident or a step in the plot. Incident to an essential part. Part of the scheme. Yes, Your Honor. Both words are used. And I think the difference between this case and the case decided by the appellant Par, Mays, and even Kahn, all of those involved post-fraud wires or mailings. In this particular case, the wire is in the middle. It's during the ongoing fraud. That is a material difference. I think that that's why the cases that the government cited, like Schmuck and Samson, go more to the heart of what this wire actually was. There was a case that the government cited in particular, United States v. Garner. And in that case, it was just a simple phone call where it was a casino scheme, where it was just a phone call by the co-conspirators that says, hey, when are we going to the casinos? That was an essential step in the plot. Similar here, Mr. Cowell, as you look at the invoices and the evidence that was presented, he set this up under Northpoint Investments, one of the ventures that was involved in the Ponzi scheme. It was in the middle of the day. It was between 12 and 2. The invoice shows it was for about 100 investors. And so it was essential. The wires themselves were essential, a step in the plot. It's not some sort of backroom accounting or post-fraud. Well, you're not saying the wires were essential. I think you're saying they're incidental to an essential part of the scheme, which was to maintain the image of Cowell being a very successful and prosperous businessman. Correct, Your Honor. And I think that Schmuck even points out that innocent mailings or routine business mailings can also be similar to the wires in this case, where they're innocent wires between Amex and the Hyatt can be used. Moving on to the evidence in this case and the probativeness of that evidence, starting with the Goldman Sachs email exchange and the letters, that was Mr. Cowell's M.O. That's what he did. He did it throughout the Ponzi scheme. He took these letters and used these investment banks to tout his fraud. He started with Ameriprise back in April of 2005. It's what got him fired. He put the Ameriprise letterhead on a letter that he sent to investors to make them believe that Ameriprise was backing this real estate investment. And so the Goldman Sachs letters were probative of Mr. Cowell's intent. The appellate cites the case Gonzalez-Milkor to show that the heat stroke that was admitted is somehow related to the other parts of the evidence that the government admitted, including the Goldman Sachs letters, the Bentley, the watch, the luxury items, and to say, well, you know, it's like that heat stroke. It's not like the heat stroke, though, because in that case, the heat stroke didn't go to an element of the offense. Contrary, in this case, all of those purchases went to an element of the offense. The government had to prove that Mr. Cowell had the fraudulent intent and that he was engaged in a scheme to defraud. And the government cited cases that show that misuse of investor funds goes exactly to those two elements, and that's exactly what the government was doing when it was introducing that evidence. To say that the purchases weren't linked up, it's just not correct. If you look closely at the receiver's testimony, the receiver analyzed and collected over 40 bank accounts. The receiver looked at those bank accounts and determined that those bank accounts did not contain any profits from the scheme. They didn't contain any income from the scheme. They didn't contain any payroll from Mr. Cowell. It was investor money only. And so if those accounts were used to pay for these items, the only logical conclusion is that the money came from investors. And I think that that was supported by the record. Each and every one of those pieces of evidence was probative of intent. What about the e-mails? Weren't they pretty inflammatory and not really necessary to prove up the scheme? With all due respect, Your Honor, no. I think they were important to show Mr. Cowell's state of mind even as the scheme was starting to collapse and collapsing. I mean, what Mr. Cowell was doing in those e-mails, if you take Mr. Cruz, for example, Mr. Cruz was the investor who was mocked as turtle. He asked for his money back before the freeze even occurred. And Mr. Cowell said, 10 business days, you'll get your money back. Well, almost a year later, Mr. Cruz wants to know, where's his guaranteed investment that Mr. Cowell promised would be safe? And Mr. Cowell now reaches a point where he's mocking Mr. Cruz and saying to him, hey, you're a turtle, you know, and using inflammatory language. It goes directly to his state of mind. Mr. Cowell still doesn't want the investors to uncover the Ponzi scheme or to discover, you know, what his fraudulent intent was. He still does not want them to believe that he defrauded them. And I think that's exactly what those e-mails show. I think the government was very careful, too, when we introduced those e-mails at trial. When they were used, for example, the e-mail with the F word in it, the government redacted the F word in its opening statement and in its closing argument and didn't even refer or use the word itself when arguing those e-mails and the relevance to the jury. With respect to the sentencing issues, I think it's clear that what Judge Burns was doing with regards to the restitution is he was considering 3553A7. It's something that a sentencing court has to do. I think it would have been error for Judge Burns not to analyze and try to find out about where the money was. Actually, on this one, I think neither party cited an important case. As a general rule, it is right that a defendant cannot be punished for invoking a Fifth Amendment right. That's Mitchell. But the case that you didn't deal with and the line of cases that you didn't deal with is 445 U.S. 552 and 557 and 562. If there's no Fifth Amendment right or if the Fifth Amendment right is waived, then what the defendant says, in my view, and I want to give you a chance to address this, can be taken into account. So here, as I read the record, what the judge, the judge in almost every comment was indicating to Mr. Cowe that he would give a lower sentence if Mr. Cowe would help find the money so the people could get restitution, the victims could get restitution. That is the burden of it when you read all of them together. And then Mr. Cowe spoke with his lawyer. This is at ER 185. And he said he would speak. He wanted the courtroom empty. But at the moment, I look at that as a counseled, voluntary waiver of the Fifth Amendment right that he had. And then at that point, he refused, for a variety of suggested reasons, to talk about where the money went or was. The judge, it appears to me, there still would be an issue, in my mind, if the judge punished him for not cooperating, even though he no longer had a Fifth Amendment right. But I don't get the sense that the judge did that. The government was advocating the high end of the guidelines, 480 months. It appears from the pre-sentence report that's not in the record, but we received under seal, that the government, that the parties knew probation's recommendation, 480 months. And the judge gave a sentence at the low end of the guidelines, 360 months, without any indication that he would have given a lower sentence, except if Mr. Kyle cooperated. So in the moment, and there are some Second Circuit cases that make this distinction, Stratton, 820, F-2nd, 562, 564, Whitten, 610, F-3rd, 108, 195. He wasn't punished for not cooperating, but he didn't get the reward that the judge indicated he would provide if Mr. Kyle helped find the money. Is that a reasonable reading of the record? I think initially, yes, Your Honor. It is a reasonable reading of the record, just to answer the question. Are you familiar with the Roberts case? Yes, I am, Your Honor. Also, I would also cite to United States v. Rutledge, which is in the government's brief on page 61. It's at 28 F-3rd, 998. Pincite is 1002. It's a Ninth Circuit case from 1994. It does address when a defendant has the right to remain silent, and then they waive that right. Once they relinquish that right, they falsely deny such conduct. The district court can waive a false denial in considering reduction for acceptance of responsibility. So it's with respect to a particular sentencing factor, but I think the analogy can be made in this context as well. Judge Burns was giving Mr. Kyle a carrot and saying, I don't believe you don't know where the money is. You're a sophisticated businessman with a degree and an extensive background. You're a smart person, and you're not coming forward with where the money went. And Mr. Kyle just declined all offers, and it was his decision to do that. But I think that Your Honor is correct. Judge Burns didn't punish Mr. Kyle for doing that, for refusing to tell the court where the money was. And, in fact, the government even came forward and said, that's what Rule 35 is for, and that we made that overture as well to Mr. Kyle. Mr. Kyle changed his mind today and decided to tell the court where the money is. Could the government still make a Rule 35 motion? Not today, Your Honor, because, as you know, it has to be within a year of sentencing. The motion has to be within a year of sentencing. I don't know when sentencing was. It was in May of 2011. So to go back to your point, Your Honor, that's something that I think the court was properly considering, though, because the court would have committed error if it didn't consider providing restitution to victims. It had to do that. And it believed that Mr. Kyle knew where the stolen money was located. Finally, I would just end with, I don't think that there was recusal issues in this case. I think that Judge Burns properly did not order recusal. I think you should look to the Clemens case, also the recent Ninth Circuit case in Wrangell. I cited it in my brief, but it has been amended since then. It was amended in October of 2012, 697 F. 3rd, 795. I think there it was clear that that judge at sentencing said he had empathy for the victims, and that wasn't biased. I don't think the fact that two other judges, as in Clemens, had a lien placed on them that Judge Burns also would have biased. Thank you. All right. Thank you very much, counsel. You've exceeded your time. I'd give you a minute if you have something you want to say. Yes, Your Honor, just to address issues that I didn't get to in my case. I would just like to point out that the judgment that the district judge gave was the same as the one at page 8. The Supreme Court said it has to be incident to an essential part of the scheme. Actually, that's in – I found it too. It's in Schmuck as well. Yes. I knew it was there somewhere. I just didn't have the sight. I want to point out about the sentencing. The district judge here said, I don't want to go easy on you if I think you still have the money. But the point is he did believe he still had the money, even though he said, I know there's no evidence for that. So the judge started out at a higher level. I'm not going to go easy. I'm not going to come down unless you convince me otherwise, despite the fact that I have no evidence that you know where this money is. And as to the recusal, all I can say, Your Honor, is that this office, the U.S. Attorney's Office, recused themselves in the Lean case. They were recused. According to the governance theory, that means that there was actual bias against Mr. Cao. If there was actual bias against Mr. Cao in the Lean case, how is there not actual bias against him in this case? Thank you.
judges: Wolf, Wardlaw, Gould